AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
для the
District of New Jersey

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Olympus Corporation of the Americas | ) | Case No. |
| | ) | 16-3524 (MF) |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2006 through 2011__ in the county of _____ in the District of __New Jersey__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 | Defendant conspired to commit violations of the the Anti-Kickback Statute, 42 U.S.C. 1320a-7b(b) |

This criminal complaint is based on these facts:

See Attachment A

☑ Continued on the attached sheet.

_____
Complainant's signature

Ashley R. Oblak, Special Agent, HHS-OIG-OI
Printed name and title

Sworn to before me and signed in my presence.

Date: 03/01/2016

_____
Judge's signature

City and state: Newark, New Jersey

Mark Falk, United States Magistrate Judge
Printed name and title

ATTACHMENT A

**STATEMENT OF FACTS**

**Summary**

1. From at least as early as in or about 2006, and continuing through in or about 2011, within the District of New Jersey, and elsewhere, OLYMPUS CORPORATION OF THE AMERICAS (referred to herein as "OLYMPUS"), acting through certain of its officers and employees, including senior employees, knowingly and intentionally conspired and agreed with others to commit an offense against the United States, that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, namely, kickbacks, to persons to induce such persons to purchase, lease, order, and arrange for and recommend purchasing, leasing and ordering goods and items for which payment may be made in whole or in part under a Federal health care program, namely, Medicare and Medicaid, contrary to Title 42, United States Code, Section 1320a-7(b)(2).

2. Specifically, OLYMPUS sought to, and did, induce doctors, hospitals, and other health care providers to buy OLYMPUS products by giving them various types of remuneration, including grants, payments for travel and recreational activities, consulting payments, and gifts or no-charge loans of OLYMPUS equipment, some of which sold for $20,000 or more. In this fashion, OLYMPUS facilitated more than $600 million in sales of OLYMPUS medical and surgical equipment – in particular, endoscopes – making OLYMPUS more than $230 million in gross profits from those sales.

3. At all times relevant to this Statement of Facts, the Medicare Program ("Medicare") was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The Medicaid Program ("Medicaid") was a jointly funded, federal-state health insurance program that provided certain health benefits to the disabled, as well as to individuals and families with low income and resources. The federal government provided matching funds to Medicaid and ensured that states complied with minimum standards in the administration of the program. Medicare and Medicaid are "Federal health care programs" as defined in Title 42, United States Code, Section 1320a-7b(f).

4. OLYMPUS, with its principal place of business in Center Valley, Pennsylvania, sold medical and surgical equipment to doctors, hospitals, and other health care providers throughout the United States, including in New Jersey. The doctors, hospitals, and other health care providers then used the OLYMPUS medical and surgical equipment in various procedures for which they received payments under Medicare and Medicaid. OLYMPUS's medical and surgical equipment were thus goods and items for which payment may be made in whole or in part under a Federal health care program. From

A-1

    2006 to 2011, OLYMPUS's sales of medical and surgical equipment in the United States totaled approximately $7 billion.

5. At all times relevant to this Statement of Facts, OLYMPUS did not have appropriate training and compliance programs to prevent and identify violations of federal health care laws, including the Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b). OLYMPUS did not create any Compliance Officer position until 2009 and did not hire an experienced compliance professional to fill that position until August 2010.

6. The object of the conspiracy was for OLYMPUS, and certain of its officers and employees, including senior employees, to induce doctors, hospitals, and other health care providers to buy OLYMPUS products by giving them various types of kickbacks, including grants, payments for travel and recreational activities, consulting payments, and gifts or no-charge loans of OLYMPUS equipment, some of which sold for $20,000 or more.

7. It was a part of the conspiracy that OLYMPUS awarded millions of dollars in grants through a Grant Committee that, until July 2009, was comprised largely of sales and marketing personnel. From January 2006 until June 2007, OLYMPUS's Chief Marketing Officer and Vice President of Customer Relations chaired the Grant Committee, and he was replaced by OLYMPUS's Director of Customer Relations, who chaired the Grant Committee until July 2009. OLYMPUS's management endorsed the strategy of using grants to build and retain the loyalty of OLYMPUS customers and induce purchases of OLYMPUS products. The Grant Committee often considered sales and customer relations in awarding grants, and one purpose of numerous grants was to help OLYMPUS sell products to the grant recipient. For example:
    a. On or about October 16, 2007, an OLYMPUS Vice President of Sales and member of the Grant Committee supported a $100,000 research grant to Hospital #1's Foundation because Hospital #1 was "our #1 account in the US and I have no intention of losing any of it to" a competitor.
    b. On or about October 26, 2007, the Grant Committee awarded Hospital #2 a $5,000 grant sought, at Hospital #2's request, by a sales representative to facilitate a pending $750,000 sale and the conversion of Hospital #2 from a competitor.
    c. In or about August 2006, an OLYMPUS sales representative had the Grant Committee approve an unrestricted research grant of $50,000 for three years to Hospital #3 while the sales representative was trying to make a large sale to Hospital #3, but, at the direction of the sales representative and with the concurrence of the Chairman of the OLYMPUS Grant Committee, OLYMPUS held the grant funds for several months until Hospital #3 signed the deal to purchase OLYMPUS equipment.
    d. OLYMPUS approved grants in 2007 to Hospital #9 because OLYMPUS was "getting tremendous ROI [return on investment] within [Hospital #9]," including

sales of "at least 15 full lap[arascopic] towers" and "$800,000 in outstanding quotes" in 2007.

8. It was a further part of the conspiracy that OLYMPUS paid doctors' expenses for travel, leisure, and recreation during programs requiring doctor travel, including week-long trips to Japan, to reward past purchases and induce future purchases of OLYMPUS products. For example:
   a. In or about October 2007, multiple senior executives caused OLYMPUS to agree to pay for three doctors to spend a week in Japan as a quid pro quo for the decision of Hospital #4, a prominent California institution, to switch from a competitor to OLYMPUS's products, after which one of the doctors thanked OLYMPUS for "providing so much extra entertainment that we did not expect."
   b. Every year from 2006 through 2009, OLYMPUS treated the physician president of a prominent professional organization and (except for 2009) his or her spouse to a week-long trip to Japan and paid the physician a $10,000 honorarium to give one lecture during the trip.
   c. OLYMPUS paid for doctors' lavish meals, ballooning, winery tours, golf, and spa treatments at an OLYMPUS-sponsored forum because it was "a great way to network, talk business, socialize without our competitors."
   d. In 2006, OLYMPUS invited the key doctor for a Midwestern hospital system to a week-long trip to Japan and approved a grant sought by the doctor. On September 8, 2006, an OLYMPUS vice president wrote the person responsible for the invitation, who was also chair of the Grant Committee, to thank him for the support: "We have received all of the orders expected and have kept [a competitor] completely out of the [Midwestern hospital] system. Hooray!"

9. It was a further part of the conspiracy that OLYMPUS gave, or loaned for extended periods without charge, endoscopes and other equipment to doctors and institutions, some of which cost $20,000 or more, in order to win business and induce purchases of OLYMPUS products. For example:
   a. While Hospital #5 was considering a proposal to purchase more than $3 million in OLYMPUS equipment and services, an OLYMPUS Vice President approved donating tens of thousands of dollars of equipment to Hospital #5 in order to "neutralize" a competitor's efforts.
   b. From in or about January 2006 through in or about September 2010, OLYMPUS senior executives caused OLYMPUS to give Doctor #1 approximately $400,000 in endoscopes and other equipment to use without charge in his private practice, and OLYMPUS believed Doctor #1 had a major role in the decisions of Hospital #6, a leading New York medical center, to buy millions of dollars in products from OLYMPUS.
   c. OLYMPUS gave Hospital #7, a large Midwestern institution, free use of demonstrative and loaner equipment worth over $1,000,000 to retain the customer

A-3

and keep out a competitor, thus inducing further purchases of OLYMPUS products.

d. In 2007, OLYMPUS approved a donation of equipment to a Southern hospital system because it was building a new hospital "and we need access for potential sell of $300k."

e. OLYMPUS loaned demo equipment without charge to Hospital #10 as part of a conversion of the account from a competitor, and an OLYMPUS regional sales director recommended extending the loan a year later even after recognizing that the loan was "certainly inappropriate especially given the AdvaMed Guidelines on leaving equipment in accounts."

f. Under the Medical Loaner Sale program, OLYMPUS sales representatives would loan endoscopes to customers without charge for months and sometimes more than a year for the express purpose of inducing the customers to purchase that equipment.

g. When equipment leases came to an end, OLYMPUS would allow the customers to keep the old equipment and skip several months of payments, in order to induce the customers to sign a new lease.

10. It was a further part of the conspiracy that OLYMPUS made consulting payments to doctors, including payments made without a written agreement, with one purpose of the payments being to induce purchases of OLYMPUS products. For example, from 2006 to 2011, OLYMPUS paid approximately $112,300 in consulting payments to Doctor #2, who OLYMPUS believed to be influential in the purchasing decisions of Hospital #8, a leading southeastern medical institution.

11. In furtherance of the conspiracy, and to effect its objects, OLYMPUS committed the following overt acts in the District of New Jersey and elsewhere:

a) In or about October 2007, multiple senior executives caused OLYMPUS to pay for three doctors to spend a week in Japan as a quid pro quo for the decision of Hospital #4, a prominent California institution, to switch from a competitor and purchase OLYMPUS products.

b) In or about August 2006, an OLYMPUS sales representative caused the Grant Committee to approve an unrestricted research grant of $50,000 for three years to Hospital #3 while the sales representative was trying to make a large sale to Hospital #3. At the direction of the sales representative and with the concurrence of the Chairman of the OLYMPUS Grant Committee, OLYMPUS held the grant funds for several months until Hospital #3 signed the deal to purchase OLYMPUS equipment.

c) From in or about January 2006 through in or about September 2010, senior executives caused OLYMPUS to give Doctor #1 – who OLYMPUS believed had a major role in the decisions of Hospital #6, a leading New York medical center, to buy

A-4

        millions of dollars in products from OLYMPUS –approximately $400,000 in endoscopes and other equipment to use without charge in his private practice. .

    d)      On or about October 26, 2007, the OLYMPUS Grant Committee, which included several senior executives, awarded Hospital #2 a $5,000 grant sought, at Hospital #2's request, by a sales representative to facilitate a pending $750,000 sale and the conversion of Hospital #2 from a competitor.

12. As a result of payments of kickbacks made pursuant to the conspiracy described above, OLYMPUS induced more than $600 million in purchases of OLYMPUS medical and surgical equipment. OLYMPUS made more than $230 million in gross profits from those sales.